UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SUSAN MAY FARLEY,

                                   Plaintiff,

        v.                                             5:10-CV-536
                                                (TJM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                   Defendant.
_____

GREGORY R. GILBERT, ESQ., for Plaintiff
MICHELLE L. CHRIST, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### REPORT-RECOMMENDATION

    This matter was referred to me for report and recommendation by the Honorable

Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636

(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General

Order 18.

## I.    PROCEDURAL HISTORY

    Plaintiff filed[1] an application for disability insurance benefits on April 3, 2007,

claiming disability since October 6, 2003. (Administrative Transcript ("T.") at 9, 62-

68, 106).  Plaintiff's application was denied initially on June 11, 2007, (T. 40-43), and

_____

    [1] In his decision, the Administrative Law Judge (ALJ) stated that plaintiff "protectively filed"
her application on April 3, 2007. (T. 9).  When used in conjunction with an "application" for benefits,
the term "protective filing" indicates that a written statement, "such as a letter," has been filed with
the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20
C.F.R. § 404.630.  If a proper statement is filed, the Social Security Administration will use the date
of the written statement as the filing date of the application even if the formal application is not filed
until a future date.

she requested a hearing before an Administrative Law Judge (ALJ) (T. 44).  The

hearing, at which plaintiff testified, was conducted on July 29, 2009. (T. 18-38).

In a decision dated September 2, 2009, the ALJ found that plaintiff was not

disabled.  (T. 9-16).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

March 17, 2010.  (T. 1-5).

## II.    ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.      The ALJ erred in ignoring the opinion of State Agency consultative
        physician, Dr. Burton Shayevitz in determining plaintiff's Residual
        Functional Capacity. (Pl.'s Brief at 6-8) (Dkt. No. 8).

2.      The ALJ improperly discounted plaintiff's credibility. (Pl.'s Brief at 8-9).

3.      The ALJ erred in determining that plaintiff could perform a full range of
        light work. (Pl.'s Brief at 10-11).

Defendant argues that the Commissioner's determination is supported by substantial

evidence and should be affirmed. (Def.'s Brief) (Dkt. No. 11).

For the following reasons, this court finds that the ALJ improperly assessed

both plaintiff's residual functional capacity and her credibility.  Therefore, I will

recommend remanding the case for further proceedings.

## III.   APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he is "unable to engage in any substantial

2

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520 and in 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work.  Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.  The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may

not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards

were applied, even if the decision appears to be supported by substantial evidence.

*Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors

justifying his findings with sufficient specificity to allow a court to determine whether

substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d

Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the

decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  *Williams on behalf of*

*Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be

"more than a scintilla" of evidence scattered throughout the administrative record.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v.*

4

*NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   MEDICAL EVIDENCE

Plaintiff has been diagnosed with a variety of impairments, principally involving her back, neck, and right shoulder.  She claims that her disability began as the result of a car accident that occurred on October 6, 2003.  Following the accident, plaintiff went to the emergency room.  (T. 125-30).  Plaintiff complained of pain from her shoulder blades to her neck, lower back pain, and pain radiating down her arm. (T. 127).  X-rays of the cervical spine were "negative" for any abnormalities. (T. 129). Her neck was tender, but she had full range of motion, with only mild bilateral discomfort. (T. 126).  Her neurological exam was normal, with good gross and fine motor skills. *Id.*  She was given instructions to ice her neck, rest, and wear a soft collar. (T. 125).  She was told to take 200 milligrams of Advil[2] every eight hours and discharged with a diagnosis of "acute cervical strain." (T. 125-26).

After the accident, plaintiff was examined by Dr. Edward J. Galvin, D.C.  In Dr.

---

[2] While she was in the hospital, she was given 800 milligrams of Motrin for pain. (T. 126).

Galvin's October 9, 2003 report, he stated that plaintiff was a former patient, who began seeing Dr. Galvin for back and neck pain in February of 2003, but that he had not seen her since June of 2003,[3] and that she had been asymptomatic until the October 6, 2003 car accident. (T. 139-41).  Plaintiff saw Dr Galvin sixteen times between October 9, 2003 until December 3, 2003. (T. 131-48).  Dr. Galvin's October 9, 2003 report states that plaintiff was complaining of "acute severe neck, mid back and lower back pain." (T. 139).  She appeared to be in severe distress due to the pain. *Id.*  Plaintiff's tests were positive for cervical strain/sprain; thoracic strain/sprain; and lumbosacral strain/sprain. (T. 140).

Dr. Galvin stated that plaintiff had decreased intersegmental joint motion at L3, L4, L5 sacroiliac joint bilaterally. (T. 140).  She had muscle hypertonicity: moderate on the left cervical muscles and severe on the right, moderate for the thoracic muscles bilaterally and severe for the lumbar muscles bilaterally. (T. 140).  Plaintiff had tenderness to palpation at various points throughout her spine, from the cervical to the lumbar area. *Id.*  Dr. Galvin found that plaintiff was "totally disabled" and that her prognosis was "guarded" due to the nature of the soft tissue injuries and the mechanism of the injury.  (T. 141).  He ordered x-rays of the thoracic and lumbar spine, and found that they were "negative" for fracture. (T. 141).

Dr. Galvin's reports indicate that in the subsequent months, plaintiff's

---

[3] Plaintiff's previous medical records from Dr. Galvin have also been included in the transcript. (T. 142-43, 145-47).

complaints of pain were consistent, and her condition[4] improved somewhat. (T. 133, 135).  On November 24, 2003, Dr. Galvin reported that plaintiff was still in quite a bit of pain, but was starting to see some gradual improvement. (T. 133).  Dr. Galvin's treatments generally consisted of adjustments, soft tissue mobilization, and manual massage. *Id.*  On November 19, 2003, Dr. Galvin reviewed plaintiff's MRI[5] and found no evidence of disc herniation in the cervical spine, only mild disc bulging at C4-5 and C5-6. (T. 132-33).  There was a hemangioma at T2-3; a small left paracentral disc protrusion at L5-S1, extending into the neuroforamina; a narrowing of the neuroforamina at L5-S1 and T11 and T12 with bulging at that level. (T. 132).  Dr. Galvin updated plaintiff's diagnosis to include Cervical Disc and Lumbar Disc Syndromes. *Id.*  Plaintiff stated that she was still having pain in her upper back, mostly in the left mid scapular area that Dr. Galvin stated was "consistent with discogenic referred pain." *Id.*  She had some alternating pain into her upper extremity and lower extremity, but that her lower extremity symptoms were much less severe, and she was showing signs of improvement. *Id.*

However, Dr. Galvin stated that he felt that plaintiff could not return to work because "the nature of her job involves lifting." *Id.*  He told plaintiff that if she continued to have a "slower than anticipated response," he would send her for physical therapy for "concurrent care" and a stabilization program. *Id.*  On December

---

[4] Dr. Galvin's ultimate diagnosis was Vertebral Sublaxation Complex at various levels of the spine. (*See e.g.* T. 133-35).

[5] Plaintiff had an MRI at Oswego Hospital on November 14, 2003.

1, 2003, plaintiff reported that prolonged sitting exacerbated her pain. (T. 134).  Dr. Galvin stated that plaintiff was experiencing persistent spasm in the lower neck, upper back, and lower lumbar spine. (T. 138).  Plaintiff was also had decreased range of motion of both the cervical and lumbar spine. *Id.*  Plaintiff was "referred out" for an orthopedic evaluation," and her treatment with Dr. Galvin was temporarily suspended at that time.[6] *Id.*

Plaintiff was referred to Dr. Richard DiStefano at Syracuse Orthopedic Specialists (SOS), who first examined plaintiff on December 15, 2003. (T. 264-66). Dr. DiStefano's examination of the cervical spine showed normal alignment, with mild tenderness over the midline posterior cervical spine, but no evidence of muscle spasm. (T. 265).  Range of motion was mildly limited. *Id.*  Motor and sensory examinations of the left and right arms were normal, and reflexes were normal and symmetric for the upper extremities.  Shoulder alignment was normal, muscle bulk was normal, palpation revealed no tenderness, and plaintiff had a full range of motion. Plaintiff had mild midline tenderness in the lumbar area, and her range of motion was reduced moderately.  Plaintiff's gait was normal, and a supine straight leg test was negative bilaterally.  A neurological examination of her lower extremities was normal.

---

[6] Plaintiff also saw another chiropractor. (T. 190-99).  Dr. Patrick Nicholson of Community Chiropractic submitted a form-report, dated April 30, 2007. *Id.*  In this report, he indicates that he saw plaintiff once on December 6, 2006. (T. 190).  He stated that plaintiff had hypertonicity (extreme muscular tension) in the cervical, thoracic and lumbar paravertebrals; right shoulder depression; 35 degree straight leg raising bilaterally; and sublaxations at various cervical, thoracic, and lumbar levels. (T. 192).  Dr. Nicholson submitted a range of motion chart, indicating limited ranges of motion in the cervical and lumbar spine. (T. 196).  However, Dr. Nicholson refused to estimate plaintiff's RFC because he had not seen her for three months. (T. 194).

(T. 265).   Dr. DiStefano read plaintiff's MRI results and found that there was no herniation in the cervical spine and a small left L5-S1 herniation. (T. 266).   Dr. DiStefano diagnosed cervical and lumbar sprain/strain. (T. 266).   He stated that he had nothing to offer plaintiff surgically and referred her to the pain clinic. *Id.*

Plaintiff was also treated by Dr. Jeffrey Kahn, Board-Certified in Physical Medicine and Rehabilitation. (T. 149-58).   The first narrative report written[7] by Dr. Kahn was dated November 19, 2004.[8] (T. 151-52).   In this first report, Dr. Kahn stated that plaintiff was attending therapy twice weekly, and told the doctor that she was better able to do exercises at home. (T. 151).   Plaintiff's head and shoulders were protracted, and she was flexed at the waist.   With correction of her posture, she complained of increased thoracolumbar and left buttock pain. (T. 151).   When Dr. Kahn examined plaintiff's right shoulder, plaintiff had "marked pain with crying on palpation to all shoulder girdle structures with marked impairment of range of motion due to pain complaints." *Id.*   Strength was generally diminished in all four limbs due to pain. *Id.*   Dr. Kahn mentioned to plaintiff that her pain could be exacerbated "due to

---

[7] The court notes that although the first report written by Dr. Kahn was dated November 19, 2004, the medical records submitted with Dr. Kahn's reports show that plaintiff had an MRI of the spine on September 20, 2004, which was sent to Dr. Kahn, and a nerve conduction study on October 19, 2004, which is signed by Dr. Kahn. (T. 154-55).   The September 30, 2004 MRI showed disc space narrowing and desiccation at T11-12 and L5-S1. (T. 156).   There was "Disc/osteophyte complex at T11-12 and disc bulging at L5-S1, but no significant interval change. (T. 156).   The October 19, 2004 study showed no evidence of lumbar radiculopathy or peripheral neuropathy as tested. (T. 155).   The doctor stated that there was a "discogenic" component causing plaintiff's low back pain and possibly hip pain "with additional soft tissue discomfort." (T. 155).

[8] The ALJ's decision contains an error regarding the date that plaintiff began seeing Dr. Kahn. (T. 12).   The ALJ states that Dr. Kahn's report is dated October 6, 2003 (T. 12), however, October 6, 2003 was the date of plaintiff's accident.   Dr. Kahn's first report is dated November 19, 2004. (T. 151).

impaired mood," but plaintiff denied "any pre-existing depression." *Id.*  He suggested that plaintiff be started on an anti-depressant for pain management purposes. (T. 152).

There are additional hand-written notes on Dr. Kahn's November 19, 2004 report from his subsequent examination that was dated December 28, 2004. (T. 152). There is a separate type-written report, also dated December 28, 2004. (T. 149-50). Plaintiff told Dr. Kahn that she had started aquatic therapy, "provided at the suggestion of the IME evaluator," but that she was worse after the therapy. (T. 149). The physical examination showed normal sacroiliac alignment and motion bilaterally. (T. 149).  Plaintiff had a "blunted depressed affect and [sat] in slouched and guarded posture for the right arm." *Id.*  A neurological examination of the lower extremities showed that plaintiff had a non-dermatomal pattern of sensory alteration.[9]  Reflexes were 2+ at the knees and 1+ at the ankles bilaterally.  Muscle testing was 4/5 in both lower extremities due to complaints of pain. *Id.*

An examination of plaintiff's right shoulder showed that the maximum active abduction and flexion was limited to only 75 percent, and due to plaintiff's complaints of pain, Dr. Kahn could not examine the shoulder further through passive range of motion. *Id.*  Neurological examination of the upper extremities was normal for all parameters, but cervical range of motion was reduced at the end ranges in all directions. *Id.*  Dr. Kahn appeared to be attempting to separate her accident-related

---

[9] A dermatome is an area of skin that is supplied with nerve fibers from a single spinal nerve root. DORLAND'S MEDICAL DICTIONARY 196 (Shorter Ed.1980).  The surface of the skin is divided into dermatomes. *See* MERCK MANUAL OF DIAGNOSIS AND THERAPY, 18th Ed. § 16, ch. 206, fig. 206-1 (Mark H. Beers, M.D. and Robert Porter, M.D. eds. 2006).

conditions from those "pre-existing," however, he did state that he believed there were "some pre-existing psychosocial issues which impact negatively on her overall pain perception." (T. 150). Dr. Kahn referred plaintiff for an MRI of her shoulder to "rule out objective injury to the right shoulder." *Id.*

Dr. Kahn told plaintiff that, unless there was a treatable lesion within the shoulder," she and her primary care physician were going to have to work together to "better manage her psychosocial issues, get her on medications that she will take with regularity, and stabilize her mood and overall outlook toward her present situation before further treatment can be provided." *Id.* He discussed injections in the form of epidural nerve blocks, but plaintiff was hesitant to attempt those at that time. *Id.* Dr. Kahn stated that he might also recommend that she be referred to a pain clinic. *Id.* In a hand-written note, dated January 6, 2005, Dr. Kahn noted that plaintiff called to cancel her appointment and stated that she would like to proceed with an orthopedic referral for "possible surgery." *Id.*

An MRI on plaintiff's shoulder was conducted on the afternoon of December 28, 2004. The MRI showed moderate osteoarthritis of the acromioclavicular joint with a small inferiorly projecting spur. (T. 153). There was abnormal signal density in the distal supraspinatus tendon, suggesting tendinosis and possible partial tear. (T. 153). Handwritten notes on the MRI report indicate that Dr. Kahn spoke to plaintiff on January 3 and 4, 2005. (T. 153). Dr. Kahn stated that plaintiff would prefer to try physical therapy[10] prior to surgery, and Dr. Kahn noted that he would make the referral

---

[10] On the date of Dr. Kahn's report, plaintiff was already attending physical therapy.

11

the same week. (T. 153).

Plaintiff attended physical therapy sessions.  In a report, dated April 7, 2005, Physical Therapist, Robert W. Burton noted that plaintiff had been treated at his office at "various times for her various pain complaints but physical therapy has not been terribly effective."[11] (T. 159).  He noted that plaintiff had an injection in her shoulder one month prior to the report, and had a significant decrease in symptoms until she bumped her elbow, compressing her shoulder joint, and her shoulder pain had returned "to approximately 50 percent of what it was prior to the injection." *Id.*

In the April 7, 2005 report, Physical Therapist Burton found that plaintiff experienced pain and tightness in with all movements of the shoulder. (T. 159).  She exhibited cervical flexion during active shoulder movements, and her scapular motion was also "not normal." *Id.*  She had limited motion and pain in all planes, and although there was better movement and less irritation than when she was previously treated in that office, the irritation was worse than immediately after her injection. *Id.*  The plaintiff's prognosis was "guarded" because physical therapy had not been very effective in the past. *Id.*

The record contains reports from Dr. Robert L. Tiso of the New York Pain Center,[12] together with reports from St. Joseph's Hospital Health Center in Syracuse. (T. 231-62).  Plaintiff's first visit to the New York Pain Center was October 25,

---

[11] The letter was addressed to Dr. Ronald Baker, M.D. and implied that, although plaintiff had been treated in the past, this was a new referral. (T. 159).  However, the records from Ricardi and Burton Physical Therapy, P.C. date back to November 1, 2004. (*See* T. 173).

[12] The New York Pain Center has offices in Fayetteville and Liverpool, New York. (T. 242).

2005.[13] (T. 242-44).  This initial report indicates that plaintiff also had a "history" of Fibromyalgia. (T. 242).  Physical examination showed many areas of muscle tenderness and pain. (T. 243).  For the first time in plaintiff's records, the results also showed "18/18 fibromyalgia trigger points." *Id.*  The "initial impression" was fibromyalgia; cervical spondylosis without myelopathy;[14] lumbar spondylosis without myelopathy; and lumbar degenerative disc disease. *Id.*  In addition to adding a prescription for Lyrica,[15] the doctor told plaintiff to stop taking Ibuprofen and Tylenol. (T. 244).  He also prescribed a left lumbar transforaminal epidural nerve block, aquatic therapy for six to eight weeks, and sent her for a nerve conduction study of the upper extremities. *Id.*

The nerve conduction study was done[16] on December 28, 2005 and showed the presence of bilateral cervical radiculitis/radiculopathy at C6 and/or C7.  There was no evidence of peripheral neuropathy, myopathy, or ulnar nerve entrapment. (T. 249).  The test did not rule out median nerve entrapment in the arms. *Id.*  Plaintiff had lumbar nerve blocks on November 17, 2005, December 21, 2005, January 25, 2006, and May 3, 2006. (T. 232-35).  She had two cervical injections, one on June 28, 2006

---

[13] This initial report was signed by Jill C. Malinowski, MS FNP (a nurse practitioner) ***for*** Dr. Tiso. (T. 244).  It appears that because the language below the signature states that it was signed for the doctor, the report was reviewed and/or adopted by the physician.

[14] Myelopathy is defined as any functional disturbance and/or pathological change in the spinal chord. DORLAND'S MEDICAL DICTIONARY 449 (Shorter Ed.1980).

[15] Lyrica or Pregabalin is a medication used to relieve neuropathic pain and to relieve the pain of fibromyalgia. www.ncbi.nim.nih.gov/pubmedhealth/PMH0000327.

[16] The test was performed by Rina C. Davis, M.D. at the New York Pain Center.

and the second, on July 19, 2006. (T. 237, 188).  She had a shoulder and a "trigger point" injection on April 3, 2008. (T. 258-60).

Plaintiff went to the emergency room twice in January of 2006 because of her back pain. (T. 175-83).  During the January 30, 2006 visit to the emergency room, plaintiff stated that she had a back "flare up" approximately one month before the January 30th emergency room visit, but "otherwise [had] none in a long time." (T. 180).  X-rays taken of the thoracic spine during the January 30, 2006 emergency room visit showed normal vertebral body height and alignment. (T. 183).  However, the x-rays also showed that the disc space between T11 and T12 was narrowed, and osteophyte formation was noted between T5 and T9, but there was no bone destruction. *Id.*  The conclusion was changes of thoracic spondylosis. *Id.*

In an April 18, 2006 report from the New York Pain Center, Dr. Tiso stated that plaintiff did exercise in the form of walking or treadmill exercises on a daily basis. (T. 186).  He noted that the nerve blocks had provided plaintiff with good relief until she hit a pothole while driving, and the pain returned. *Id.*  Although she had tenderness over the paraspinous and trapezius muscles, her cervical spine showed good symmetry and there was no evidence of vasomotor or pseudomotor instability in the right versus the left upper extremity. *Id.*  Plaintiff had tenderness noted over the sacroiliac musculature. *Id.*  The doctor noted that bending and lifting exacerbated plaintiff's pain. *Id.*

The June 6, 2006 report from New York Pain Center, signed by Nurse Practitioner (NP) Margaret Donovan, on behalf of Dr. Tiso, stated that the May 3,

14

2006 nerve block provided "moderate" reduction in plaintiff's pain, but that she was complaining of increased neck and right arm pain. (T. 184).  The report also noted that the trial of Lyrica and Mobic was "ineffective." *Id.*  Although plaintiff had full range of motion in her upper and lower extremities, she had trapezial and cervical paraspinous tenderness, with SI joint tenderness. *Id.*  Plaintiff told NP Donovan that plaintiff was "walking regularly," and that although she tried aquatic therapy, she did not have a facility near her home. (T. 185).

On May 22, 2007, plaintiff was consultatively examined for the Commissioner, by Berton Shayevitz, M.D., of Industrial Medicine Associates. (T. 211-15).  Dr. Shayevitz noted that plaintiff appeared to be in some distress, but her gait was normal, she used no assistive devices, she could do a full squat, needed no help changing for the examination, could get on and off the examination table, and was able to rise from a chair without difficulty. (T. 213).  The range of motion in her cervical spine was limited by pain[17] in various directions, but there were no trigger points. *Id.*  Forward elevation of her right shoulder was limited by pain. *Id.*

She had full range of motion in both her shoulders, but plaintiff could only elevate her right shoulder to 80 degrees, limited by right shoulder pain. *Id.*  Right shoulder abduction was limited by pain in the shoulder and in the deltoid muscle. *Id.* There was no joint inflamation, effusion, or instability, but the strength in plaintiff's right arm proximal and distal muscles was 3.5/5. *Id.*  There was no muscle atrophy or sensory abnormality. *Id.*  Plaintiff had pain on flexion of the lumbar spine and

---

[17] The pain was described as "slight" as to rotary movements. (T. 213).

extension was limited by stiffness. *Id.*  There was no SI joint or sciatic notch tenderness, no spasm, no scoliosis or kyphosis.  (T. 214).  Straight leg raising was negative bilaterally, and there were no trigger points. *Id.*  Plaintiff's lower extremities were essentially normal, but reflexes could not be elicited at the knees or ankles. (T. 214).

Dr. Shayevitz reviewed x-rays of both the cervical and lumbar spine. *Id.*  His diagnoses were right shoulder probable rotator cuff injury, degenerative arthritis in the cervical spine with probable radiculopathy down the right arm, and degenerative arthritis of the low back.[18] (T. 214).  In his "Medical Source Statement," Dr. Shayevitz stated that plaintiff's

> [r]ight arm and shoulder pain almost markedly limit her
> ability to lift, carrying [sic], push, pull.  She is well above
> moderately limited head motions, which could interfere with
> her ability to drive or operate machinery.  Degenerative
> disease in the low back between moderately and markedly
> limits her ability to lift, bend, push, pull, [and] carry.

(T. 214).  On June 7, 2007, a non-examining "Disability Examiner," apparently reviewing Dr. Shayevitz's findings, determined that plaintiff could perform light work. (T. 217-24).

Plaintiff continued to go to the New York Pain Center through 2007, 2008, and 2009. (T. 250-306).  On October 23, 2007, plaintiff was "encouraged" to utilize the elliptical bike for exercise and do some stretching and some aerobic exercise to

---

[18] Plaintiff also suffered from seasonal allergies, had a history of asthma and had been treated for Hepatitis C. (T. 214).

"strengthen her core." (T. 253).  On January 22, 2008, NP Mark A. Profetto stated that plaintiff's pain was exacerbated with bending, pushing, and pulling. (T. 254). Plaintiff denied being engaged in any regular physical activity or physical therapy, but that she was "just starting psychological intervention and she is not sure whether it is helping . . . ." *Id.*  Physical examination showed that plaintiff had tenderness in the trapezius muscles on the right side and greater occipital and cervical paraspinous tenderness on the right side. (T. 255).  Although the range of motion of the head and neck was normal, plaintiff had right shoulder discomfort. *Id.*  There was SI joint tenderness on both sides and sciatic notch tenderness on both sides, range of motion was normal without pain. *Id.*  Biceps and triceps were equal and symmetric, but very weak. *Id.*  On March 20, 2008, plaintiff had significant paracervical and trapezius tenderness bilaterally, greater on the right than the left. (T. 256).  She had significant pain with passive range of motion of her right shoulder, and she was unable to abduct past 90 degrees. (T. 256).  She had only mild paraspinous tenderness bilaterally. *Id.*  A review of plaintiff's medications showed that she was being tried on various medications. (T. 257).  The March 20, 2008 report shows that plaintiff was being changed from Ultracet to Ultram ER, and they were discontinuing the Ambien[19] because it made her sleepy. (T. 257).  Plaintiff also began taking Cymbalta again. (T. 261).

On September 2, 2008, plaintiff stated that her pain was exacerbated by bending, sitting, standing still, reaching, pushing, pulling, lifting and "raking for a

---

[19] The Ambien was started on October 23, 2007. (T. 253).

long time." (T. 261).  Although she had no thoracic paraspinous or vertebral tenderness on palpation, she had significant shoulder pain and limited range of motion. (T. 261).  She was referred for repeat MRIs and for further orthopedic evaluation. (T. 262).

Plaintiff returned to Syracuse Orthopedic Specialists and was examined by Dr. Warren Wulff. (T. 268-71).  On January 14, 2009 (after the date plaintiff was last insured), plaintiff had moderately limited cervical range of motion, secondary to pain. (T. 269).  She had a "severely painful range of motion of her right shoulder." *Id.* There was "dramatic tenderness to palpation throughout her entire spine, cervical to lumbar paraspinal muscles, consistent with myofascial disease."[20] (T. 269).  The motor strength in her upper extremity muscles was 5/5, and she had normal sensation to light touch throughout both upper extremities.  Reflexes were 2/2 in biceps, triceps, and brachoradialis. (T. 270).

Dr. Wulff concluded that plaintiff's pain was myofacial, and he did not advocate any further "spinal intervention such as surgery," but she "clearly has something happening to the right shoulder." (T. 270).  Later reports from SOS focused on plaintiff's shoulder pain. (*See* T. 275).  On February 11, 2009, Dr. Todd Battaglia diagnosed degenerative changes in the AC joint and rotator cuff tendonosis/tendonitis. (T. 276).  There was a moderate amount of AC joint inflammation, though no discrete

---

[20] Myofascial pain syndrome is also known as fibromyalgia.  The Merck Manual defines this disorder as a common nonarticular disorder of unknown cause, characterized by pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissues. *See* MERCK MANUAL OF DIAGNOSIS AND THERAPY, 18th Ed. § 4, ch. 40, p.321 (Mark H. Beers, M.D. and Robert Porter, M.D. eds. 2006).

impingement with moderate rotator cuff tendinosis as well. *Id.* On March 4, 2009, Dr. Battaglia stated that plaintiff had an "excellent response to AC joint injection," and that she was "still essentially symptom free." (T. 279).

## V.   **NON-MEDICAL EVIDENCE**

At the time of the hearing, plaintiff was forty eight years old and had completed the ninth grade in school. (T. 22-23). Plaintiff's last employment was an assistant manager at Dollar General, and she was trained to be a manager. (T. 24). She testified that her last job required her to lift between twenty and forty pounds. (T. 25). She also testified that she was on her feet almost all day at her previous work. (T. 25-26). Plaintiff testified that she had "pain episodes," starting in her back and radiating to the front. (T. 27-28). When she has one of these "episodes," her stomach starts to swell, she gets nauseated, and the pain is so bad that she cannot even get to the hospital. (T. 28, 30). She stated that she could only sit for ten to twenty minutes before she had to stand and walk around, but that she could only stand for about half an hour, and she had to keep moving because she could not stand still for very long. (T. 28). Plaintiff estimated that she could only walk for half an hour and could only lift three pounds "if I'm lucky." (T. 29). Plaintiff also testified that she gets tingling and numbness in her arms, but it is "mostly pain." *Id.*

Plaintiff testified that her right shoulder "catches," and the pain radiates down her back and arm. (T. 30). When asked if she had any hobbies, plaintiff stated that she tries to read. (T. 31). Plaintiff took various medications for pain at different times. She testified that she was taking Mobic, but it was discontinued because it was not

effective. (T. 32).  She also stated that she was taking Flexeril and using Lidoderm patches. *Id.*  She took steroids for a period of time, but discontinued them within three months, after she gained almost 70 pounds, without any reduction of the pain. (T. 32). She also testified about her nerve blocks and stated that her pain episodes got worse after the nerve blocks. (T. 33).

Plaintiff testified that, during the day, she wears her patches to get comfortable, sits, stands, and walks around a lot during the day. (T. 34).  She drives "once in awhile," but she was driving less because she could not lean her back on the car seat. (T. 34).  She did not cook, and only helped doing the dishes by washing some silverware, cups, or plastic bowls, if they were not too heavy. (T. 34).  Her husband helped with the housework, and her youngest son helped with many of the household chores, including vacuuming, sweeping, doing dishes, and carrying the laundry. (T. 35).  She could only write for ten minutes at a time, and although she could bathe herself, her husband helped her to dress and undress, particularly when she was having pain episodes. (T. 35).

Plaintiff also testified that she had attended counseling, but had to stop when she became unable to afford it. (T. 36).  She testified that she was taking Cymbalta for her depression and anxiety, but had to discontinue that medication because it was raising her blood pressure. (T. 36).  Although she stated that she switched to another medication, she had to discontinue it because it made her drowsy. (T. 36).  At the time of the hearing, she had been off the medication for a year. (T. 37).  She stated that although she had some crying spells, she was not sure whether it was her back or from

menopause, because her doctor told her that she was "very menopausal." (T. 37).

## VI.   **ALJ'S DECISION**

The ALJ determined that plaintiff suffered from three severe impairments: fibromyalgia, cervical spondylosis without myelopathy, and lumbar degenerative disc disease, none of which, singly or in combination, rose to the level of a Listed Impairment. (T. 11).  The ALJ then determined at Step Four of the five-part disability analysis, that plaintiff had the residual functional capacity (RFC) to perform a full range of light work. *Id.*  In making this determination, the ALJ reviewed the medical evidence of record, rejecting the opinion Dr. Galvin's opinion that plaintiff was "totally disabled," because "the objective findings of the medical doctors do not substantiate his opinion." (T. 14).  The only mention of the opinion of the Commissioner's consulative examiner, Dr. Berton Shayevitz, was to briefly cite his diagnoses. (T. 13).

The ALJ rejected plaintiff's complaints of disabling pain as "not credible or consistent with more [sic] supported by the preponderance of medical and other evidence of record. (T. 14).  The ALJ based his credibility determination, in part, on plaintiff's "poor work history," and concluded that any pain that plaintiff did suffer was not disabling. (T. 14).  The ALJ then relied upon the "State Agency's expert medical doctors and other expert consultants," who found that plaintiff had the RFC for a full range of light work. (T. 14).  Based on this finding, the ALJ utilized the Medical Vocational Guidelines (The Grid) to find that plaintiff was not disabled,

through the date that she was last insured,[21] based upon her age, education, and prior work experience, and considering any non-exertional impairments that plaintiff alleged. (T. 15-16) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.18).

## VII.   ANALYSIS

### 1.   Residual Functional Capacity

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities. Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.*  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

---

[21] Plaintiff was insured for disability benefits only through September 30, 2008, and she was required to establish her disability on or before that date.

In this case, the ALJ finds that plaintiff can perform a wide range of light work. Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567 (b).  When the weight lifted is "very little," a job is still in the light work category when it requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*  The regulations also state that in order for an individual to be considered capable of performing a "full or wide range" of light work, she must "have the ability to do substantially all of these activities." *Id.* Finally, if the individual can perform light work, there is a presumption that he or she can do sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

In this case, the only doctor who found that plaintiff had the ability to perform light work was a non-examining review physician, who only cited findings from Dr. Shayevitz's report and then came to a conclusion that was inconsistent with Dr. Shayevitz's opinion, based on those findings.  The ALJ never mentioned the fact that Dr. Shayevitz found almost "marked" restrictions in plaintiff's ability to lift, carry, push, and pull because of her shoulder pain, together with a "moderate to marked" limitation on her ability to lift, bend, push, pull, and carry, due to her low back pain. (T. 214).  Although Dr. Shayevitz did not specify how much weight plaintiff would still be able to handle when performing these functions, there is no other support in the record for a determination that plaintiff could lift up to 20 pounds or that she could sit, stand, or walk for any period of time.

Plaintiff was examined by, and received treatment from her chiropractor, Dr. Galvin, approximately sixteen times in the months subsequent to the car accident. (T. 131-42).  Dr. Galvin found that plaintiff was "totally disabled." (*See e.g.* T. 140).  The ALJ gave "very limited weight" to Dr. Galvin's findings because the "objective findings of the medical doctors do not substantiate his opinion." (T. 14).  The court is well-aware that it is the province of the Commissioner to make the determination of whether an individual is "totally disabled." *See Joseph v. Barnhart*, 302 F. Supp. 2d 45, 54 (E.D.N.Y. 2004) (ultimate determination of disability is reserved for the Commissioner) (citing 20 C.F.R. §§ 404.1527(e), 416.27(e); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  This would be true even if the individual stating his or her opinion of "total disability" were a medical doctor. *Id.*  It is also true that a chiropractor is only listed in a section of the regulations, entitled: "other sources," who may be considered to show the severity of plaintiff's impairments and how they affect her ability to work, but who may not be considered to determine whether an individual has established a "medically determinable impairment." *Compare* 20 C.F.R. § 404.1513 (a)(1 *with* 20 C.F.R. § 404.1513(d)(1).

The ALJ specifically found that plaintiff had fibromyalgia, cervical spondylosis without myelopathy, and lumbar degenerative disc disease.[22] (T. 11).  The issue here is the effect of these impairments on plaintiff's ability to perform an exertional category of work.  Even if one is not "totally disabled," she may not be able to perform light

---

[22] The court also notes that an electrodiagnostic study from December of 2005 showed that plaintiff had bilateral cervical radiculopathy at C6-C-7. (T. 249).

work, or more specifically, to lift up to twenty pounds or sit, stand, or walk for the requisite amount of time necessary to perform a full range of light work.  The ALJ must still base a function-by-function analysis on substantial evidence.

Even assuming the ALJ properly disregarded Dr. Galvin's opinion of "total disability," Dr. Galvin's objective findings of range of motion limitations are similar to those of all the other physicians.  The doctors at the New York Pain Center found tenderness throughout plaintiff's back during most of her visits. (*See e.g.* T. 186-87; 184-85; 250-51; 252-53).  The July 30, 2007 report stated that there was cervical paraspinous tenderness, and range of motion was decreased on extension. (T. 251). There was SI joint tenderness bilaterally, and the right shoulder had decreased range of motion in relation to the left upper extremity. *Id.*  On March 20, 2008, plaintiff had "significant" paracervical and trapezius tenderness bilaterally, mild paraspinous tenderness bilaterally, but had "significant" pain with passive range of motion of her right shoulder. (T. 256).  Plaintiff had numerous injections, which initially helped relieve the pain, but the pain returned. (*See* T. 186).

The ALJ also mentioned that the record also shows that the "State Agency's expert medical doctors and other expert consultants" determined that plaintiff could perform light work. (T. 14).  The ALJ then cites ***one*** report from a non-examining medical consultant. (T. 14) (citing Ex. 13F, T. 219-24).  This is a single report, written by one individual.[23]  It is unclear what "other" experts the ALJ means.  The other

---

[23] In fact, in a footnote in defendant's brief, he was apparently prepared to concede that this individual (S. Putcha) was not a physician. (Def. Brief at 8 n.7).  In this footnote, defendant argues that even if the consultant was not a physician, the ALJ merely "agreed" with his findings, so any

consultative physician was Dr. Shayevitz.  He found that plaintiff had both marked and moderate limitations.[24] (T. 211-15).

Defendant takes issue with Dr. Shayevitz's statement that plaintiff would have difficulty driving, but that plaintiff's testimony was "inconsistent" because she stated that she tried to drive "as much as I can." (T. 90).  However, the fact that plaintiff states that she "tries" to drive, implies that it may be difficult for her.  Additionally, at the hearing, plaintiff testified that, although she drove "once in a while," she was driving less because she couldn't lean her back on the seat. (T. 34).  Thus, the court does not find this to be an "inconsistency," sufficient to reject Dr. Shayevitz's opinion.

There is no evidence to indicate that plaintiff could sit, stand, or walk for the requisite amount of time required for light work.  The ALJ simply did not perform a function-by-function analysis, and the analysis that he did perform was not supported by substantial evidence.  Defendant's arguments do not save the analysis and are themselves inconsistent.  Thus, this court finds that this case should be remanded to the Commissioner for a proper analysis of plaintiff's RFC.

---

error was harmless. (Def. Brief at 8).  At the same time, defendant argues that the ALJ properly rejected Dr. Galvin's report because he was a chiropractor, and therefore, not an acceptable medical source.  *Id.*  The court has discussed that argument above.  With respect to S. Putcha's identity, he is a state agency review physician, Dr. Sury Putcha. *See Sorensen v. Commissioner of Social Security*, 3:06-CV-554 (N.D.N.Y. Jan. 7, 2010) (Dkt. No. 11 at 14).

[24] Defendant argues in one paragraph of his brief that the examination findings of Dr. Shayevitz "support that plaintiff can perform light or sedentary work, and in the next paragraph, argues that plaintiff's argument that the ALJ should have adopted Dr. Shayevitz's opinion that plaintiff was markedly or moderately limited in various abilities "is without merit." (Def. Brief at 7).  Apparently, defendant would have the court adopt some of Dr. Shayevitz's findings, but not all of them, and not his conclusion.

2.    **Pain and Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ."  20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.  *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location,

27

duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

In this case, the ALJ found that plaintiff was not credible because it would not be reasonable to "conclude that the minimal findings could be the basis for the degree of pain alleged by her." (T. 14). None of the doctors indicated that they believed plaintiff was exaggerating her pain. Plaintiff underwent several nerve blocks in an attempt to relieve her neck and lower back pain. Plaintiff did testify that she could only lift up to three pounds. While this may be an exaggeration, there is no indication that plaintiff does not suffer pain that would prevent her from performing light or sedentary work.

The ALJ also found that plaintiff's poor work history did not bolster her testimony. *Id.* While it is true that poor work history may be considered in rejecting plaintiff's credibility,[25] the only basis for the ALJ's statement that plaintiff had a poor work history was the fact that she did not work between 1992 and 1998.[26] However,

---

[25] *See Johnson v. Astrue*, 2010 WL 4316722, *11 (N.D.N.Y. Oct. 26, 2010) (citing Social Security Ruling (SSR) 96-7p (work history is a consideration when assessing credibility); *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) (a claimant with a good work record is entitled to substantial credibility)).

[26] The ALJ does not actually say that this "gap" is the "poor work history," defendant's brief makes this statement. (Def.'s Brief at 10). Defendant also improperly cites the record. The "gap" is

the ALJ never asked plaintiff why she did not work during this period of time.  He asked plaintiff about her former employment, but never asked the reason for the gap in employment, and apparently made an assumption that she did not work because she did not wish to work.  Thus, this court finds that the ALJ's credibility determination is not supported by substantial evidence.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the Commissioner's decision be **REVERSED**, and this case be **REMANDED**,  pursuant to sentence **four** of 42 U.S.C. § 405(g), for a proper determination of plaintiff's residual functional capacity and a proper consideration of plaintiff's credibility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 22, 2011

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

---

between 1992 and 1998, not 1999. (T. 117).